D. W. L., INC., a corporation,
Plaintiff in Error,

v.

GOODNER–VAN ENGINEERING COMPA-
NY, a corporation, Defendant in Error.
Nos. 39431, 39528.

Supreme Court of Oklahoma.

May 23, 1962.

Rehearing Denied July 3, 1962.

Green & Feldman, Wm. S. Hall, George A. Farrar, Tulsa, for plaintiff in error.

Tucker, Boyd & Parks, Philip N. Landa, Tulsa, for defendant in error.

BERRY, Justice.

This was an action on open account by vendor who provided restaurant equipment and supplies for the Holiday Inn Motor Hotel at Tulsa, Oklahoma. The parties waived a trial by jury, submitting the cause to the court. Plaintiff-vendor, Goodner-Van Engineering Company, recovered a judgment in the sum of $38,539.91 against the defendant, D. W. L., Inc., the corporate lessee and operator of the hotel establishment. When it became apparent that defendant elected to appeal from this judgment without superseding it, plaintiff instituted below an ancillary proceeding in aid of execution. This proceeding culminated in an order appointing a receiver for the defendant. Upon trial court's refusal to vacate this order, defendant perfected therefrom another appeal. The two separate appeals—each timely brought here by the defendant—were consolidated for disposition. The decisive question presented for our consideration is whether defendant, operator of the hotel, is legally liable to the plaintiff-vendor for the account in litigation. An outline of the record appears necessary to a proper determination of the issue.

The Holiday Inn of Tulsa owes its inception to an idea conceived and promoted by Dr. Charles E. McCracken, a Tulsa dentist and businessman, who secured a "franchise" license from the Holiday Inns of America, Inc., and purchased the building site upon which the hotel was erected. Seeking funds and aid for the venture, the doctor associated himself in the project with a group of Chicago investors composed of Messrs. Seymour N. Logan, Morris R. DeWoskin and Merwin S. Rosenberg. As a result of their financial arrangements, several different corporations were organized. The land upon which the facility was built is owned by the Creek Land Development Company; the buildings and improvements constructed upon the site are held by another corporation, the Turnpike Hotel Company, which has a long-term lease from the landholding company. The Turnpike

corporation, which calls itself "the underlying landlord", subleased the entire premises to yet another corporation, the defendant D. W. L., Inc., who assumed complete responsibility for the operation and management of the physical facilities. D. W. L., Inc. is wholly owned by the Chicago group named earlier in this opinion; the two major stockholders in the landholding company and the underlying landlord corporation were Dr. McCracken and Mr. Logan of the Chicago group. Each of these men was allotted an equal number of shares. Mr. Logan was also a principal stockholder and officer of defendant D. W. L., Inc.

Under the terms of its lease with the underlying landlord, it was defendant's sole obligation to procure and acquire all necessary furnishings, both for the hotel and the restaurant. The defendant did not at first have any employees or representatives in Oklahoma, and it depended largely on Dr. McCracken, a resident of Tulsa, to assist it as a local contact man in finding "people who would provide furnishings for this area". In course of this activity Dr. McCracken invited plaintiff's sales engineer to design, recommend and submit plans for suitable restaurant arrangements. Initially, defendant intended to operate the restaurant as a part of its hotel business, but later decided to sublease this establishment to an independent concern. Dr. McCracken's aid was then enlisted "to see if you could find someone in the local area to operate the restaurant". Pursuant to this direction, Dr. McCracken located one David Gordon who expressed interest in "taking over the restaurant" but "he was not in a financial condition where he could do it by himself". Gordon prevailed on Dr. McCracken to participate with him in this business venture. The doctor agreed. They then organized another corporation, Catering Service, Inc., which, on March 3, 1959, subleased from defendant, D. W. L., Inc., the restaurant facilities of the hotel. Catering Service operated the restaurant until August or September of 1959, when it filed a

proceeding for involuntary bankruptcy and lost its lease under an automatic termination clause embodied therein.

As we view defendant's brief, its chief argument is that the equipment purchased on the account sued upon in this action was procured by Dr. McCracken, acting as an agent of Catering Service, Inc., and not as representative for the defendant. It stands admitted that in his dealings with plaintiff Dr. McCracken was acting "in a disclosed representative capacity". The point in controversy appears to be whether in law and in fact he was the agent for sublessee, Catering Service, Inc., or of the defendant-hotel operator.

The negotiations between Dr. McCracken and plaintiff's engineer were initiated at Mr. Logan's request in the summer of 1958, when defendant stood firmly committed to its original idea of operating the restaurant. Even the final agreement of purchase took place before the sublease of the restaurant premises to Catering Service was executed. According to the record, on February 13, 1959, plaintiff's sales engineer outlined a detailed offer of sale in a letter forwarded directly to defendant's office in Chicago. A short time later the sales engineer received a telephone call from Chicago, in which Dr. McCracken, then visiting in that city, accepted the offer on express instructions from Mr. Logan. So far as the record discloses, Catering Service was not then in the "picture"; nor was it even in existence as a corporate lessee of the restaurant. It, therefore, follows that up to the time of the outlined transactions Dr. McCracken was acting for no entity other than the defendant who had the sole responsibility of furnishing and equipping its restaurant facility.

The subsequent sublease agreement with Catering Service, Inc., did not effect a change in the obligation resting on the defendant. Nor did it require Catering Service to adopt the contract with the plaintiff. The responsibility for procuring the restaurant equipment charged on the account in question continued to be that of the defend-ant. Under the unmistakable terms of the lease, defendant undertook to pay $22,500.-00 in cash on the purchase price, and to advance and "make available" to Catering Service all funds up to the aggregate sum of $60,000.00. The equipment so acquired was " * * * to be and belong to lessor, notwithstanding any contribution of lessee toward the purchase * * *". Catering Service, as lessee, bound itself to contribute $37,500.00 by repaying this sum over a period of 30 months. The parties clearly understood that the primary obligation to secure funds for payment of plaintiff's account rested on defendant and that the defendant would be the sole owner of the property so purchased. On March 9, 1959, defendant issued its check to plaintiff for $22,000.00, of which $20,150.00 was credited upon this account, and the remainder of $1,850.00 was refunded by plaintiff to apply on another purchase in connection with the same project. Dr. McCracken testified that defendant was " * * * to put in the first $60,000.00, be responsible for the first $60,000.00 facilities" and Mr. Logan expressly approved the contract with plaintiff. Defendant construed its primary obligation in the same light. Mr. Logan's letter of March 10, 1959, requesting a bank loan for payment of plaintiff's account, sets forth:

> "DWL, Inc. is paying for restaurant and hotel equipment in cash * * *, the restaurant furnishings amount to approximately $60,000.00. We have paid twenty-five percent down on these purchases * * *"

The equipment and supplies for which recovery is sought were delivered to the hotel between February and July, 1959. Between February 24 and August 19, 1959, numerous invoices, covering major items of purchase, were mailed by plaintiff to defendant's office in Chicago. No satisfactory proof was offered by defendant of any objection or protest made upon its admitted receipt of these statements. No question was raised as to the correctness of plaintiff's billing until August 24, 1959, when it

became obvious that Catering Service stood on the brink of failure.

Defendant retained all the equipment and supplies sold by plaintiff and asserts title thereto. Even before plaintiff completed its delivery, defendant mortgaged the equipment to the underlying landlord. In the chattel mortgage instrument defendant warranted its title to the equipment. Defendant also claimed the equipment as its own in the sublease agreement with the successor of Catering Service, Inc.

The correctness of the account and delivery of items charged therein is not challenged. Neither can it be disputed in the light of the evidence, as narrated, that the primary and sole obligation for payment of the indebtedness to the plaintiff was expressly assumed by defendant in its lease from the underlying landlord.

■ This primary responsibility continued to rest on defendant after its sublease of the restaurant to Catering Service. The actions of Seymour Logan in respect to the transaction corroborate Dr. McCracken's testimony that the purchase was "approved" and authorized by defendant. Dr. McCracken was a competent witness, and his testimony, coupled with the other evidence outlined earlier in this opinion, amply supports the conclusion that he was acting under express authority from defendant's official, Mr. Logan.

■ It is a rule too well settled to admit of debate that while agency may not be proved by extra-judicial declarations of the alleged agent to third parties, it may be established by the agent's testimony concerning the existence of such agency and by his proof of the transaction with his principal, by which the agency was created. Benham v. Selected Investments Corporation, Okl., 313 P.2d 489, 493; Munn v. Mid-Continent Motor Securities Co., 126 Okl. 241, 259 P. 249; Pierce Petroleum Corp. v. Hales et al., 147 Okl. 42, 294 P. 160; Whitcomb v. Oller et al., 41 Okl. 331, 137 P. 709, 710.

■ Moreover, defendant, who from the very beginning, was kept informed of Dr. McCracken's "every move", had full knowledge of the transaction and retained all of its fruits. It will be deemed to have ratified his acts and cannot be heard to deny its liability.

■ The ratification by acceptance of fruits flowing from a transaction made by a person whose authority is denied constitutes a form of estoppel whose application is not dependent on reliance by one party upon the representation and conduct of another, nor on the intent of the principal to ratify. Where an alleged principal claims that a person who negotiated a business deal was not in fact his agent at all, but was merely a volunteer, a self-constituted agent, or an agent for another, he will nevertheless be held bound by whatever obligations or liabilities were assumed by his pretended agent in consummating the transaction, if such principal insists on retaining the fruits of the unauthorized transaction. 15 O.S.1961, §§ 70 and 75 provide respectively:

"Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal."

"A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known to the person accepting."

See also, Okmulgee Coal Co. v. Hinton et al., 95 Okl. 92, 218 P. 319, 322; Negim & Co. v. Harp et al., 98 Okl. 261, 225 P. 347; and First Nat. Bank of Muskogee v. Clark, 93 Okl. 23, 219 P. 370. In the last cited case it is held:

"Although a party may not have directly authorized an act which was performed, yet, where such party accepts the benefits of the act, it amounts to a ratification, and the party so ratifying the action taken accepts the burdens along with the benefits to be derived."

See also, 2 C.J.S. Agency §§ 49 and 66.

We find this language in Whitcomb v. Oller et al., supra, at p. 710 of 137 P. most appropriate and applicable to the facts in this cause:

"In addition to the evidence of agency and proof of authority to the agent, the rule may properly be invoked that when a principal, after knowledge that an agent, without authority, has purchased for him certain property, retains possession, and uses the same for a considerable period of time, and obtains the benefit thereof, such acts constitute a ratification of the unauthorized act of the agent, and renders the principal liable for the payment of the purchase money. * * *"

Even aside from the question of agency, defendant could not defeat its liability for the account in question. While the debt was partially incurred with its knowledge of all facts, it undertook in the sublease to Catering Service, to provide funds for payment of plaintiff's account. Such promise to Catering was legally enforceable by the plaintiff, at its option, since plaintiff was a third party beneficiary thereof; plaintiff could nevertheless treat the defendant as its principal debtor, while Catering Service, if the latter was in fact the original promisor, would occupy the status of a surety for the account. See Sigmon v. Rorabaugh-Brown Dry Goods Co. et al., 110 Okl. 17, 235 P. 921.

There is competent evidence to support the trial court's judgment. In an action at law, where the jury is waived, the determination of the trial court has the same force and effect as the verdict of a properly instructed jury, and its judgment will not be disturbed on appeal, if there is any competent evidence to support it. Western Steel Erection Co. v. Gatlin, Okl., 319 P.2d 607.

We next pass to consider defendant's appeal from trial court's refusal to vacate its order appointing a receiver. Defendant complains: (a) the appointment was premature; (b) mere failure to supersede a judgment does not justify the harsh and drastic action of imposing a receivership; (c) the appointment of a receiver may be made only after execution has been returned unsatisfied. In support of its argument defendant cites decisions of this Court which deal with the trial court's power to impose receivership pendente lite. These cases are obviously not in point.

The statute, 12 O.S.1961 § 1551, makes a specific provision for appointment of a receiver "After judgment, to carry the judgment into effect." The exercise of the power so vested is not contingent on want of other available remedies. Since the proceeding is controlled by statute, relief may be granted even though there be no absence of legal remedies. The authority to appoint a receiver after judgment for the purpose of carrying it into effect does, by its very terms, contemplate an ancillary proceeding in aid of execution and may be exercised where it is deemed to be more effectual or beneficial than the ordinary process at law. Edmonston v. Sisk (10th Cir.), 156 F.2d 300, 303.

In accordance with these principles, we held in Jones et al. v. Cabaniss, 185 Okl. 237, 90 P.2d 650, that the posting of a supersedeas bond does not per se deprive the trial court of its power to appoint a receiver pending appeal, for the purpose of preserving judgment debtor's property.

In the case at bar, receivership was sought for the purpose of protecting defendant's funds from diversion, and to apply the current receipts from the hotel operations, as well as the rental payments of sublessee, toward the satisfaction of the judgment. The liquidation of defendant's hotel business was neither sought nor contemplated. In these circumstances we find no abuse of discretion in the trial court's action. Edmonston v. Sisk, supra; Jones et al. v. Cabaniss, supra.

The trial court's judgment allowing recovery against the defendant and its order appointing a receiver are accordingly affirmed.